IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | Case No. 05-12871 (MCF) |
| DECKERS CONSTRUCTION, INC., | Chapter 7 |
| Debtor(s). | |
| EUROBANK, | |
| Plaintiff(s), | Adv. No. 09-00239 (MCF) |
| v. | |
| WESTERNBANK PUERTO RICO, | |
| Defendant(s). | |

OPINION AND ORDER

The controversy before the Court revolves around competing security interests in accounts receivable of the Debtor, Deckers Construction, Inc. (hereafter referred to as "Debtor" or "Deckers"). Plaintiff, Eurobank, now Oriental Bank (hereafter referenced to as "Eurobank"), asserts that it has a super priority interest over Defendant, Westernbank Puerto Rico, now Banco Popular de Puerto Rico (hereafter referenced to as "Westernbank"), in the accounts receivable of Deckers even though Westernbank's security interest was recorded prior to Eurobank's. Eurobank contends that its junior security interest trumps Westernbank's because Eurobank's security interest falls within the scope of a purchase money security interest (hereafter referenced to as "PMSI"). Defendant disagrees and

1

argues that the general rule of "first in time, first in right" governs rather than the exception of the purchase money security interest.

For the reasons set forth below, the Court holds that Eurobank's security interest does not fall within the scope of a PMSI under the Puerto Rico Uniform Commercial Code, and, consequently, the general rule of "first in time, first in right" governs in this case.

## I. UNCONTESTED MATERIAL FACTS AND PROCEDURAL HISTORY

By agreement of the parties at the initial scheduling conference,[1] this matter is appropriate for summary judgment disposition as there are no material facts in dispute and one of the parties is entitled to judgment as a matter of law, pursuant to Fed. R. Civ. P. 56(c), as made applicable to these proceedings by virtue of Fed. R. Bankr. P. 7056. Celotex v. Catrett, 477 U.S. 317 (1986)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)); Vega-Rodriguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

The relevant undisputed facts are as follows:

1. Desarrollo de Vivienda del Centro, Inc. (hereafter referenced to as "DVC") is the general partner of the Comerio Housing Limited Partnership, S.E. (hereafter referenced to as

---

[1] Docket No. 43.

2

"Comerio Housing") and Villalba Housing Limited Partnership, S.E. (hereafter referenced to as "Villalba Housing").

2. On January 10, 2002, Deckers executed a construction contract with DVC and Comerio Housing in the amount of $4,000,972.00 (hereafter referenced to as the "Comerio Project"). On that same date, Deckers also executed a construction contract with DVC and Villalba Housing in the amount of $4,471,000.00 (hereafter referenced to as the "Villalba Project"). Deckers' services under these contracts were to construct mixed residence complex apartments for the elderly and for families that qualify for a social housing program (collectively referenced to as "The Projects").

3. On February 6, 2003, Westernbank granted Deckers a line of credit in the amount of $1,500,000.00 for the operational expenses in the following construction projects: (a) Remodelación del Residencial Público Luis Muñoz Rivera; (b) Starbucks San Patricio Plaza Shopping Center; (c) Starbucks Old San Juan; (d) Estacionamiento Municipal Guayama; (e) the Villalba Project; and (f) the Comerio Project.

4. Westernbank's line of credit was guaranteed by the accounts receivable of the above-listed construction projects, including The Projects. Deckers and Westernbank executed before a notary public several security agreements for the assignment of the accounts receivable of The Projects, and executed

3

financing statements for these security agreements. The financing statements were recorded before the Department of State of Puerto Rico on March 18, 2003.

5. Subsequently, on November 26, 2003, Eurobank, granted a loan to Deckers guaranteed by a security interest in the accounts receivable of The Projects. The purpose of the loan was for "the construction of the Comerio and Villalba projects, guaranteed by a security interest in the accounts receivable that the Comerio and Villalba construction projects would generate." (Docket No. 1 ¶ 18).

6. Deckers and Eurobank executed before a notary public certain security agreements for the assignment of the accounts receivable of The Projects, and executed financing statements for these security agreements. The financing statements were recorded before the Department of State of Puerto Rico on December 3, 2003.

7. Approximately two years later, on October 31, 2005, Deckers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (Case No. 05-12871, Docket No. 1).

8. The case was later converted to a proceeding under Chapter 7 of the Bankruptcy Code on January 24, 2008. (Case No. 05-12871, Docket No. 586).

9. The Chapter 7 Trustee (hereafter the "Trustee") filed a Stipulation on October 6, 2008, regarding the outstanding sums

4

due to Debtor by DVC under The Projects. (Case No. 05-12871, Docket No. 656). As a result of said Stipulation, DVC tendered to Trustee the net amount of $900,000.00 to be kept in an interest-bearing escrow account by the Trustee pending the resolution of an adversary proceeding to be filed to determine which security interest is superior between Eurobank and Westernbank. (Case No. 05-12871, Docket No. 656).

10. The Stipulation was approved by the Court on November 17, 2008. (Case No. 05-12871, Docket No. 684).

11. Eurobank filed the instant Adversary Proceeding against Westernbank on November 30, 2009, to determine the priority and extent of its, and Westernbank's, lien over the accounts receivable in The Projects. (Docket No. 1).

12. Westernbank and Eurobank were respectively closed on April 30, 2010 by the Financial Institutions of the Commonwealth of Puerto Rico, which appointed the FDIC as receiver. The FDIC entered into purchase and assumption agreements, as well as loss-share transactions, with Banco Popular de Puerto Rico and Oriental Bank to assume all of the deposits and assets of Westernbank and Eurobank, respectively. As a result of this, Banco Popular de Puerto Rico substituted Westernbank as Defendant, and Oriental Bank substituted Eurobank as Plaintiff in the instant case.

5

13.     Westernbank and Eurobank filed their cross motions for summary judgment on May 13, 2011. (Docket Nos. 56, 57, 58, and 60).

14.     Oral arguments on the motions for summary judgment were held before the Court on October 26, 2011. (Docket No. 79).

## II. LEGAL ANALYSIS

It is undisputed and admitted by both parties that their respective perfected security interests do, in fact, cover the accounts receivable over The Projects. Both parties agree that Westernbank's security interest was recorded before Eurobank's security interest at the Puerto Rico Department of State. However, Eurobank claims that the general rule of "first in time, first in right" does not apply to its security interest because the same is a PMSI, which is excepted from the general rule and takes priority over previously perfected security interests.

To resolve the super priority issue among these competing secured creditors, we begin our analysis by looking at the priority dispositions of the Puerto Rico Uniform Commercial Code.

A) Priorities under the Puerto Rico Uniform Commercial Code

The Puerto Rico Uniform Commercial Code, also known as the Commercial Transactions Act (known in the Spanish language as the "Ley de Transacciones Comerciales"), 19 L.P.R.A. §§ 401 *et*

6

*seq.*, was enacted through Law No. 208 of August 17, 1995 (hereafter referenced to as the "PR-UCC"). By creating the PR-UCC, the Puerto Rico legislature adopted nine (9) of the thirteen (13) articles of the Model Uniform Commercial Code (the "UCC"), the premier commercial statute which has been incorporated, either in whole or in part, by the fifty (50) states, the District of Columbia and the Virgin Islands.

Article 9 of the UCC, one of the articles adopted by the PR-UCC, contains provisions regarding security interests, negotiable instruments, and consignments. 19 L.P.R.A. §§ 2001-2207. Those transactions covered by the Commercial Transactions Act shall be applicable to, including "any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts." 19 L.P.R.A. § 2002(a). In order for the security interest to be perfected over personal property, including chattel paper and accounts, the financing statement must be filed at the Puerto Rico Department of State. 19 L.P.R.A. § 2151(b).

Section 9-312 of the PR-UCC lists the order of priorities with regards to conflicting security interests over the same collateral. The same reads, at its pertinent parts:

7

(1) ...

(2) ...

(3) A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in identifiable cash proceeds received on or before the delivery of the inventory to a buyer [under certain circumstances].

(4) A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within thirty (30) days thereafter.

(5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

(b) So long as conflicting security interests are unperfected, the first to attach has priority.

(6) ...

(7) ...

19 L.P.R.A. § 2112.

When there are more than one perfected security interests covering the same collateral, the general rule of priority is that the security interest whose financing statement was registered first at the Puerto Rico Department of State shall be superior over the security interest whose financing statement was registered later. 19 L.P.R.A § 2112(5). This general maxim is known as the "first in time, first in right" rule. This rule, however, is not absolute. One of the exceptions to the same is the purchase money security interest. 19 L.P.R.A. § 2112(3)-(4).

### i) Purchase money security interest ("PMSI")

The traditional concept of a PMSI is described as follows:

> The purchase money secured creditor is often the seller of a product who has retained a security interest [over said product] to secure its purchase price....

James J. White & Robert S. Summers, Uniform Commercial Code, Hornbook Series, at 846 (5th ed. 2004).

In other words, "[a] purchase money security interest...can be either an interest that a seller of property retains to secure the property's purchase price or an interest taken by a creditor who gives value to enable a debtor to acquire rights in the collateral." Dana L. McAlister, Purchase Money Security Interests and Their Continuing Priority as to Proceeds, 34 Boston College L. Rev. 655, 656 (1993).

PMSIs are granted "super priority" over a prior security interest covering the same collateral in order to prevent a

9

"stranglehold" by a floating lienor on debtor's future access to money from other creditors. By providing this preferential treatment to PMSIs, the UCC tries to avoid the situation where:

> an un-yielding creditor may be able to frustrate future outside borrowing by his debtor, since any future lender will be confronted with the *fait accompli* of a prior perfected security interest that gives the al-ready [sic] secured party priority even for subsequent advances.[] Article 9 mitigates this undesirable consequence of the floating lien by affording a special priority to the 'purchase money' lender. The Code's favorable treatment of the purchase money lender rests on a general policy...of giving new money priority protection over old.

Thomas H. Jackson & Anthony T. Kronman, <u>A Plea for the Financing Buyer</u>, Yale L.J., Vol. 85, No. 1-2, at 1 (1975). <u>See also</u>, 1A - 7B Secured Transactions under the UCC § 7B.05("the purchase-money priority 'frees' the debtor to turn to other financers when it decides to acquire new assets").

For these reasons, a PMSI will trump a previously perfected security interest and disregard the general rule of "first in time, first in right."

### III. DISCUSSION

In order to consider whether Eurobank's security interest qualifies for super priority status as a PMSI, Eurobank must show that it either complies with Section 9-107(a) or Section 9-107(b) of the PR-UCC, 19 L.P.R.A. § 2007.

Section 9-107 of the PR-UCC states:

> A security interest is a 'purchase money security interest' to the extent that it is

(a) Taken or retained by the seller of the collateral to secure all or part of its price, or

(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

Id.

A PMSI under Section 9-107(a) is "inspired by the traditional conditional sales contract: the seller retaining 'title' to secure the purchase price of the goods...". 1A-7B Secured Transactions under the UCC § 7B.04. Section 9-107(a) is inapplicable to the instant case in light of the fact that Eurobank's transaction consists of a financing transaction to provide funds for the construction of the Comerio and Villalba projects, and is not a sales agreement of any kind. Therefore, Eurobank's security interest does not qualify as a PMSI under Section 9-107(a).

Whether Eurobank's security interest qualifies as a PMSI under Section 9-107(b), the Court must consider if Eurobank, through the financing granted to Deckers, and the security interests created therein: (1) extended new value to Deckers; (2) to be used to enable Deckers to acquire rights in the accounts receivable; and (3) whether Deckers used said value for the intended purpose of acquiring rights over the accounts receivable of The Projects. See MBank Alamo Nat'l Ass'n. v.

11

Raytheon Co., 886 F.2d 1449, 1453 (5th Cir. 1989)(the creditor moving for PMSI consideration over accounts receivable must show "(1) that it gave value; (2) that the value given enabled [the debtor] to acquire rights in the accounts receivable; and (3) that the accounts receivable qualify as collateral within the meaning of the statute.").

These factors must be scrutinized in the following fashion:

(1) *New value vs. antecedent debt.* The purchase money creditor took its interest to secure new value either in the form of an advance, an obligation or the delivery of the collateral itself. As comment 2 to old Section 9-107 stated: "any security interest taken as security for or in satisfaction of a preexisting claim or antecedent debt" is excluded from the purchase money category.

(2) *Acquisition vs. retention or production or generation.* **The purchase money creditor enabled the acquisition of the collateral rather than enabling the retention of the assets or their production or generation in the debtor enterprise**...

(3) *Intent vs. happenstance.* **A creditor who disbursed funds for general operational purposes that did not involve acquisitions was not moved into the purchase money category**....

Secured Transactions under the UCC § 7B.04(emphasis added).

a) New Value

Both Eurobank's financing and security agreements over the Villalba and Comerio Projects indicate that Eurobank did, in

12

fact, advance funds to Deckers.[2] Said financing was for the construction of The Projects, guaranteed by a security interest in the accounts receivable that each of the construction projects would generate.

According to Section 1-201(44) of the PR-UCC, a person gives value when he acquires rights:

> (a) In return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and whether or not a charge-back is provided for in the event of difficulties in collection; or
>
> (b) as security for or in total or partial satisfaction of a pre-existing claim; or
>
> (c) by accepting delivery pursuant to a preexisting contract for purchase, or
>
> (d) generally, in return for any consideration sufficient to support a simple contract.

19 L.P.R.A. § 451(44). See, e.g., MBank Alamo, 886 F.2d at 1452 ("The value requirement is satisfied by any consideration sufficient to support a simple contract.").

Based on the above, it is clear from the contractual documentation that Eurobank, through the financing extended on November 26, 2003, meets the "value" portion of the PMSI analysis.

---

[2] Exhibit IX of Docket No. 57; Claim No. 54-1 of Case No. 05-12871(MCF); Exhibit X of Docket No. 57; Claim No. 55-1 of Case No. 05-12871(MCF); and Docket No. 1 ¶ 18.

b) The value enabled the acquisition of the collateral

Both Eurobank and Westernbank cite the same case law to support their respective positions as to whether Eurobank's security interest over the accounts receivable of The Projects qualify as a PMSI under Section 9-107(b):[3] Northwestern Nat'l Bank v. Lectro Syst., Inc., 262 N.W.2d 678 (Minn. 1977), In re Woodworks Contemporary Furniture, Inc., 44 B.R. 971 (Bankr. W.D. Wis. 1984), MBank, 886 F.2d 1449, and First Interstate Bank of Utah v. Internal Rev. Serv., 930 F.2d 1521 (10th Cir. 1991).

Of the four cases relied upon by the parties, the decision of MBank Alamo, 886 F.2d 1449, provides us with the most comprehensive discussion as to the general concept and requirements of PMSIs. In MBank Alamo, the Court of Appeals for the Fifth Circuit, with regards to the second and third prongs of the test, the court expressed that:

> To create a PMSI, **the value must be given in a manner that enables the debtor to acquire interest in the collateral** . This is accomplished

---

[3] From a philosophical standpoint, there has been some debate as to whether accounts receivable can even enjoy PMSI status. Uniform Commercial Code, Hornbook Series, at 847("Except when they are proceeds, security interests in accounts receivable and other intangibles will not enjoy purchase money status."). However, it has been considered that, "although traditionally the only type of purchase money security interest the law has concerned itself with is that in goods, there is no reason why the purchase money concept should not apply to intangible property such as contract rights." In re Woodworks, 44 B.R. at 972 (citing Gilmore, The Purchase Money Priority, 76 Harvard Law Review 1333, 1374).

Defendant has not raised the issue of whether accounts receivable qualify for PMSI status. Therefore, the Court will make no determination whatsoever as to the applicability of one viewpoint over the other on this matter.

> when a debtor uses an extension of credit or loan money to purchase a specific item. See *Ingram v. Ozark Prod. Credit Assoc.*, 468 F.2d 564, 565 (5th Cir. 1972); *In re Dillon*, 18 Bankr. 252, 254 (Bkrtcy.E.D.Cal. 1982) (PMSI lien attaches to item actually purchased); Jackson & Kronman, *Secured Financing and Priorities Among Creditors*, 88 Yale L.J. 1143, 1165 (1979) (PMSI priority limited "to loans that can be traced to identifiable, discrete items of property.").

*Id.* at 1453(emphasis added).

The decisive factors under the second and third prongs of the three part test rely on the interplay between "value given" and "acquisition of collateral." The collateral must be obtained on or after the debtor receives the new value, and that said collateral was obtained as a result of such value. *Id.*

The court in *Northwestern*, reasoned that the definition of a PMSI "contemplates that the loaned funds be intended, and actually used, for the purchase of an identifiable asset which stands as the secured party's collateral." 262 N.W.2d at 680. The *Northwestern* court denied the creditor super priority status because "[t]his is not a case in which funds were advanced and used for purchase of a receivable; the contract was already in existence between Agate and Lectro when Cox loaned funds to Agate and entered into a security agreement with it." *Id.* This case supports the notion that accounts receivable that stem from an already existing contract prior to obtaining new value by the creditor, may not qualify for PMSI status.

15

In the case of Woodworks, 44 B.R. 971, 973, which makes reference to the decision in Northwestern, the Bankruptcy Court for the Western District of Wisconsin expressed that transactions in which funds were loaned so that borrowers could perform under preexisting contracts do not fall within the scope of a PMSI.

Finally, in the case of First Interstate, 930 F.2d at 1526 - 1527, the Court of Appeals for the Tenth Circuit states that, in a situation where a lender advances funds to a debtor for operational expenses to allow the debtor to fulfill preexisting contractual obligations, and for which the debtor, in turn, extends a security interest over the accounts receivable of said obligations to the lender, said transaction does not constitute a PMSI.

> An important distinction exists between funds extended for asset acquisition and those extended for the ordinary operation of business. A bright-line demarcation must always exist between these two purposes. To accept the lender's contention in this case would be to blur, if not eliminate, that line... Accordingly, we conclude that the right to perform the pre-existing executory contract in this case is not "collateral" or the "rights in collateral" within the requirements of the U.C.C.

Id.

The instant case contains a similar situation to the one considered in Woodworks and First Interstate. Particularly as to the fact that:

16

(1) we are dealing with a situation in which Deckers had already incurred in preexisting contractual obligations at the time it incurred in the financing with Eurobank (i.e., the constructions contracts entered between Deckers and DVC and Comerio Housing, as well as between Deckers and DVC and Villalba Housing);

(2) the financing was obtained for purposes of allowing Deckers to perform under the preexisting construction contracts; and

(3) while the financing did allow Debtor to perform under the construction contracts, the advance was not intended, nor actually used, for the purchase of an identifiable asset which stands as Eurobank's collateral (i.e., the accounts receivable). See Northwestern, 262 N.W.2d at 679; Woodworks, 44 B.R. at 973; First Interstate, 930 F.2d at 1526-1527.

The "acquisition" of Decker's right to generate and receive accounts receivable under The Projects took place back on January 10, 2002, when Deckers entered into the construction contracts with DVC, Comerio Housing, and Villalba Housing. Through the financing provided, Eurobank supplied funds to Deckers for the construction of the Comerio and Villalba Projects, and not for the specific purpose to allow Deckers to purchase or acquire rights on any accounts receivable. The

17

accounts receivable were given as a security for the repayment of the monies loaned for the construction of The Projects.

It is clear from the facts at hand that Eurobank's value enabled Deckers to fulfill its obligations under the preexisting construction contracts. Said value did not enable Deckers to acquire any rights or interest over the accounts receivable of The Projects. Furthermore, we are not faced with a situation in which the funds were advanced exclusively for purposes of allowing Deckers to acquire and/or purchase new accounts receivables. Woodworks, 44 B.R. 973; MBank Alamo, 886 F.2d 1453. In other words, Eurobank "did nothing more than fund the debtor's performance of its contracts in its ordinary business operations; it did not enable the debtor to acquire a discrete new asset." First Interstate, 930 F.2d at 1524.

In view of the foregoing, by having extended financing solely to permit Deckers to perform under a pre-existing executory contract, Eurobank's security interest in this case does not qualify as "collateral" or the "rights in collateral" within the scope of a PMSI pursuant to Section 9-107(b) of the PR-UCC.

As a means to overcome the deficiencies of the PMSI test, Eurobank proposes an alternate interpretation to its transactions and its security interest thereto distinguishable from the reasoning in the Woodwork case. Specifically, Eurobank

18

argues that it "is not claiming a security interest over the 'rights in the contract;' conversely, it is claiming a security interest or priority **over the part of the project receivables representing the reimbursement of construction costs advanced by Eurobank**, its predecessor in interest."[4]

However, according to Eurobank's contractual documentation, Eurobank's security interest consists of "moneys, rights and credits to be perceived under" The Projects (i.e., the accounts receivable).[5] Said documentation in no way distinguishes between accounts receivable and "the part of the project receivables representing the reimbursement of construction costs." The Court does not find any distinction between one characterization over the other, constituting an issue of the proverbial "tomato (/təˈmeɪtoʊ/), tomato (/təˈmɑːtoʊ/)."[6] Furthermore, Eurobank has not shown how this alleged characterization in any way demonstrates how its value allowed the acquisition over new collateral and contractual rights by Deckers, so as to comply with the PMSI test.

Eurobank also argues that it has superior rights to the proceeds from the construction contracts for The Projects under Article 1152 of the Puerto Rico Civil Code, 31 L.P.R.A. § 3224,

---

[4] Docket No. 60 at 8(emphasis added).
[5] Exhibit IX of Docket No. 57; Claim No. 54-1 of Case No. 05-12871(MCF), and Exhibit X of Docket No. 57; Claim No. 55-1 of Case No. 05-12871(MCF). (our translation)

19

due to the fact it notified its assignment of the contract proceeds to the owners of The Projects, who, in turn, acknowledged and consented to make direct payments to Eurobank.[7] Eurobank, then, goes on to admit that **"[n]otification to a debtor of a potential account receivable is not a requirement for perfection of the lien**, " but that said notification "is to establish clearly the proper payee of the contract funds, and to protect the debtor from having to pay twice."[8]

At the oral argumentation for the cross motions for summary judgment,[9] Westernbank explained that the notification provisions of Article 1152 is, in fact, a mechanism to protect a debtor from having to pay twice in those cases where the indebtedness has been assigned to a different creditor. However, contrary to Eurobank's assertion, Westernbank asserts that compliance with the same does not control the issues of perfection and priority of security interests under Article 9 of the PR-UCC.

The Court agrees with Westernabk's position that Article 1152 of the Puerto Rico Civil Code has no bearing with regards to issues of perfection or priority of the instant security interests. This matter is governed by Article 9 of the PR-UCC because Section 9-102(4) expressly excludes from its dispositions those provisions of the Puerto Rico Civil Code

---

[6] Fred Astaire, Let's Call the Whole Thing Off, (Verve Music Group)(1937).
[7] Docket No. 60 at 8.
[8] Docket No. 60 at 8(emphasis added).

20

"with respect to pledges and with respect to **transmission of credits**," such as the assignments contained in the case at bar. 19 L.P.R.A. § 2002(4)(emphasis added).

For the reasons stated above, the Court finds that Eurobank's security interests do not fall within the scope of a PMSI under Section 9-107 of the PR-UCC, 19 L.P.R.A. § 2007. Consequently, the applicable priority scheme in the instant case is the general rule of "first in time, first in right" contained at Section 9-312(5) of the PR-UCC, 19 L.P.R.A. § 2112(5).

In light of the undisputed and admitted fact that Westernbank filed its financing statement before Eurobank at the Puerto Rico Department of State, the Court hereby finds that Westernbank's security interest has priority over Eurobank in the accounts receivable of the Villalba and Comerio projects.

## ORDER

WHEREFORE, IT IS HEREBY ORDERED that Plaintiff's motion for summary judgment (Docket No. 60) shall be DENIED; Defendants' motion for summary judgment (Dockets No. 56 - 58) shall be GRANTED; and all remaining matters (Dockets No. 65, 66, and 68) are deemed MOOT.

Consequently, the Chapter 7 Trustee is hereby ORDERED to disburse to Banco Popular de Puerto Rico the consigned amount of $900,000.00, plus all accrued interest since deposited, within

---

[9] Docket No. 79.

21

thirty (30) days as a result of the "Motion for Compromise."(Case No. 05-12871, Docket No. 656).

SO ORDERED.

San Juan, Puerto Rico, this 29th day of December, 2011.


BY THE COURT:


Mildred Caban

Mildred Caban Flores
U.S. Bankruptcy Judge